KEOKUK (BARNEY v.). See Case No. 1,032.

KEOKUK (BRONSON v.). See Case No. 1,928.

KEPP (HAWLEY v.). See Case No. 6,249.

---

## Case No. 7,722.

### KEPPEL v. PETERSBURG R. CO.

[Chase, 167;[1] 3 Am. Law Rev. 389; 26 Leg. Int. 36.]

Circuit Court, D. Virginia. May Term, 1868.

DE FACTO GOVERNMENT— CONFEDERATE STATES— TREASON — TRANSACTIONS OF INSURGENT GOVERNMENT—TRANSACTIONS BETWEEN INDIVIDUALS — VIS MAJOR —DECLARATION OF DIVIDEND — STATUS OF COMPANY AND STOCKHOLDER — CONFEDERATE CURRENCY.

1. The term "de facto" as descriptive of a government, has no fixed and definite sense. It is perhaps most correctly used as signifying a government completely, though only temporarily, established in place of the lawful or regular government, occupying its capital and exercising its power. The term, however, is often used, and perhaps more frequently, in a sense less precise, as signifying any organized government established for the time over a considerable territory, in exclusion of the regular government. A de facto government of this sort is not distinguishable in principle from other unlawful combinations. It is distinguishable in fact mainly by power, and in territorial control, and by the policy usually adopted in relation to it by the national government.

[Cited in Williams v. Bruffy, 96 U. S. 192.]

2. It can not be maintained that levying war against the United States by persons, however combined and confederated (even though successful in establishing their actual authority in several states), would not be treason.

3. In the more correct sense of the word, the Confederate government was never a de facto government.

4. It may well be doubted, whether in this country treason against the United States could be committed in obedience to a usurping president and congress, exercising unconstitutional and unlawful power at the seat of the national government.

5. Acts done under the authority of an insurgent body, actually organized as a government within a large extent of territory, not merely in hostility to the regular and lawful government, but in complete exclusion of it from the whole territory subject to insurgent control, when in hostility to the regular government, can not be recognized as lawful.

6. All transactions between individuals which would be legal and binding under ordinary circumstances, can not be pronounced illegal and of no obligation, because done in conformity with laws enacted or directions given by the usurping power. Between these extremes there is a large variety of transactions, to which it is difficult to apply any general rule.

7. Transactions of the Confederate government prejudicial to the interests of citizens of other states, excluded by the insurrection and by the policy of the national government from the care and oversight of their own interests within the states of the Confederacy, can not be upheld in the courts of the United States.

8. The Confederate government can not be regarded as a de facto government in any such sense, that its acts are entitled to judicial recognition as valid.

9. The acts of the Confederate government confiscating or sequestrating property of citizens within the states adhering to the government of the United States, were null and of no effect.

10. In order for one who seeks to shield himself from liability upon the ground that the property was taken from him under the stress of vis major, he must show that the property was set apart specially for the owner, and was taken from him without consent on his part, by force, either actual or menaced, under circumstances amounting to duress.

11. The P. R. R. Co. was a railroad company in the state of Virginia during the war. K., who resided in Philadelphia during that time, owned stock in it. This stock was confiscated by a decree of the district court of the Confederate States, and certain dividends declared by the company were paid on this stock to a receiver appointed by the court without resistance or protest by the company. After the war began, K. sued the company. Held, (1) The confiscation was wholly null and void. (2) The company are liable for the dividends declared during the war, but only for a sum equal to what the Confederate money in which they were declared was worth at the time they were declared, with the interest from the time demand was made, which was from filing of the bill.

[1] [Reported by Bradley T. Johnson, Esq., and here reprinted by permission.]

12. An excuse which would avail a carrier for hire for non-delivery, might excuse such a debtor from non-payment to his creditor.

13. The moment a dividend is declared by a joint stock company, the company becomes debtor, and the stockholder creditor for the amount payable on demand.

14. The Confederate currency may fairly be said to have been imposed on the country within the control of the Confederate government by irresistible force. The necessity for using this currency was almost the same as the necessity to live. The court is bound to take judicial notice of the fact that the dollars in Confederate currency were different in value to either description of dollars recognized as lawful money by the laws of the United States.

Keppel was the owner of stock in the Petersburg Railroad Company, to the amount of thirty thousand four hundred dollars, prior to the year 1861. The company was chartered by and running a railroad within the territory of Virginia. Keppel was a citizen and resident of Pennsylvania, and the company having declared dividends during the war, payable to its stockholders, they were not claimed by nor paid to her. The dividends were declared by resolution of the directors that a dividend of such a per cent. in dollars would be paid on such a day to all stockholders, and the dividends earned by her stock amounted in the aggregate to thirty-three thousand one hundred and thirty-six dollars. While these dividends were being earned and declared, the congress of the Confederate States had passed two acts, one providing for the issue of what were known as Confederate treasury notes, and the other declaring the process by which the property of enemies to the Confederate States might be sequestrated and sold, and the proceeds of sale paid into the treasury of the Confederate States. The first law was executed by the issue of the currency provided for, which at once went into general use and was received in all transactions between man and man. The railroad continued in the transaction of its business as a common carrier, receiving in pay for its services these notes which thus in course of time represented its entire earnings. The sequestration act was also enforced. The proper proceedings were had in the district court of the Confederate States for the district of Virginia, for the sequestration of Keppel's stock, and it was condemned in due form of law, and sold by public auction. The proceeds of sale and the dividends earned, were paid into the treasury of the Confederate States. After the war was over, the railroad promptly ignored this sale and acknowledged Keppel as the true owner of the stock, but declined to account for the dividends on the ground that they had already been paid over to the Confederate States, a government de facto, or of paramount force, and claimed that they could not be made liable to pay them over again, whereupon, Keppel having died in the meantime, her administrators, the complainants, filed their bill in the circuit court of the United States for the district of Virginia against the company, claiming to be paid the dividend non obstante the sequestration, and that they having been declared in dollars, must be paid in the only dollars known to the laws of the United States. To this the defendant set up in defense the sequestration, and that the dollars meant Confederate currency dollars, which were greatly less in value than legal dollars of the United States. The cause came on on bill and answer.

H. H. Wells, for complainant.

The complainants are the owners of stock in the defendant's road to the amount of thirty thousand four hundred dollars, upon which stock dividends were declared during the war amounting in the aggregate to thirty-three thousand one hundred and thirty-six dollars. They were not paid to the complainants, but it was claimed, and doubtless was true in fact, that certain proceedings were instituted in the district court of the Confederate States of America, against the owners of this stock as "alien enemies," to sequestrate the same; that under the decree of that court the defendants paid to the Confederate sequestration agent the amount of the dividends so declared, and that the said agent sold the stock itself at public auction —but the defendants did not deliver it. The case coming on to be heard upon bill and answer, the complainants insist that neither the decree of the said district court of the Confederate States, the sequestration, nor the payment of the dividends under it, operated as a discharge of the liability of the defendants to the complainants. The Confederate States authorities (so called) while regularly organized, holding possession of an extensive territory, bringing large armies into the field in defense of its claim of sovereignty, having an actual existence, and maintaining the attitude and semblance of a government, was not a government de facto, in the sense referred to, when we speak of a political power that has authority to confer civil rights and limit obligations, or, as applied to this case, that it could not relieve the defendant from a debt due to the complainants. Whether the Confederate States (so called) are to be regarded as a political power, able to deal with civil and constitutional rights and obligations, is a political, and not a judicial question. It had only such character as the government of the United States might concede to or recognize it as possessing. McIlvaine v. Coxe's Lessee, 4 Cranch [8 U. S.] 241; Martin v. Mott, 12 Wheat. [25 U. S.] 19; [Gelston v. Hoyt] 3 Wheat. [16 U. S.] 246; U. S. v. Palmer, Id. 610; The Divina Pastora, 4 Wheat. [17 U. S.] 52; The Neustra Senora de la Cuidad, Id. 497; The Santessima Trinidad, 7 Wheat. [20 U. S.] 283; Foster v. Nelson, 2 Pet. [27 U. S.] 253; Luther v. Borden, 7 How. [48 U. S.] 1; Kennett v. Chambers, 14 How. [55 U. S.] 46; U. S. v. 129 Packages [Case No. 15,941]. Neither the pretensions

of the Confederate States to the rights of a sovereign state, nor the opposing claims of the United States, are to be judged of or decided by the rules found in the law of nations, because that code or body of unwritten law is a rule of conduct for, and applies only between, independent sovereign nations. Nor is the civil status of the Confederate States to be determined or affected by the view which may have been taken, or the recognition given by foreign nations or courts, for it is an internal question between a sovereign government and a portion of its own people, with which other governments or foreign courts have no right to meddle. U. S. v. 100 Barrels Cement [Case No. 15,945]. The United States has never recognized the Confederate States as being such a political power, or as possessing the rights and functions of a civil government. It did, however, extend, from motives of humanity, perhaps from necessity, certain belligerent rights; but at the same time claimed to itself the full exercise of sovereign rights. And this granting to these states of such limited belligerent rights was not inconsistent with a total denial of civil rights, or of the validity of the acts of their organized legislatures. Wheat. Int. Law, note, pp. 83, 84; Id. note, p. 377; Id. (Dana's Ed. 1866) § 297; Hawkins v. Filkins [24 Ark. 286]; The Brilliant v. U. S., 2 Am. Law Reg. (N. S.) p. 343; Prize Cases, 2 Black [67 U. S.] 673. The Confederate States claimed that they had a right to exercise the powers and functions of a civil government as fully as they had assumed the form of such a government, and this as an independent state or sovereignty. They appealed to the wager of battle for a settlement of the question. The decision was adverse to their claim. And now, to give the effect claimed by the defendant to the decree of the Confederate courts, is to claim for a defeat what a victory alone could achieve. All American courts are bound to treat each and all of the insurrectionary states as integral parts of the Union, subject at all times to its laws and constitution, and the United States statutes furnish this rule of decision. U. S. v. 100 Barrels Cement [supra]; Lucas v. Bruce, 4 Am. Law Reg. (N. S.) 95, 96.

From the foregoing propositions the following conclusions result: The ordinances of secession are a nullity, for the allegiance which every citizen owed to the United States was so absolute that no state or convention, decree or ordinance, could relieve him from it. The Confederate States, so called, were not, separately or in the aggregate, a body politic; therefore the government could not declare war against them; it could not recognize them, separately or together, as capable of making a surrender nor of legally performing any function hostile to the United States. No general status of belligerency was or could be conceded, and while carrying on war the distinction was at all times preserved between acts of war and civil acts. The acts of the organized legislatures, the congress and the courts of the Confederate States, so called, were absolutely null and void, ab initio, affording no legal right, authority, or protection to the defendant. None of these proceedings, then, by their own force or authority, offer a justification for the non-payment by the defendant. There are, however, a class of cases in which persons are excused from their wrongful acts, induced or resulting from a state of war; that is, where they are not voluntary, but compulsory, the result of a vis major. This is not such a case, for there was no actual force; there was simply a void order of an illegal court. There is no penalty affixed to its disobedience, for a corporation can not, like a natural person, be seized and imprisoned. The only remedy is a writ of distringas, the purpose of which is to distrain the corporation of its goods and chattels. No such writ or other compulsory process was issued. The only compulsion which, under such circumstances, would be a justification, "is such actual overpowering force, present and exercised at the time when the act was done, as renders resistance impossible." How far the foregoing propositions, or any of them, may be modified, in a case between parties resident at the time within the Confederate lines of military occupation, or civil jurisdiction, and who have voluntarily dealt with such other, in reference to the existing state of facts, it is not material to consider now—for this question arises between a non-resident—in relation to personal estate which follows the domicile of its owner. The suggestion that the earnings of the road were received in Confederate notes, payable six months after the recognition of the independence of the Confederate States by the United States, and that the complainant can now only demand payment in kind, has no foundation or authority in law, for the duty of the defendant was from time to time to declare dividends out of its net profits, and dividends, when declared, become a debt due to the stockholders, and if the money is placed in improper securities, or deposited in banks which fail, the loss falls upon the corporation, not the stockholder. It is not for the corporation to claim relief because it has done for or dealt with worthless or illegal funds. King v. Paterson & H. R. R. Co., 5 Dutch. [29 N. J. Law] 82, 504; Georgia Railroad & Banking Co. v. Scott [37 Ga. 94].

William Green, for defendant.

In preparing for the judge's use a note of my argument, I shall commit to paper only the main points, trusting to his recollection for what is subsidiary or illustrative.

I. The late (so-called) Confederate States, as one federative whole, had a government which was complete and perfect in its organization. It enacted laws by its congress, enforced them by its executive, and administered justice by its judiciary. And it main-

tained itself in arms against a most powerful opponent through a four years war, of almost unparalleled magnitude, being, during the whole of that quadriennium, zealously supported by most of the people domiciled within its territorial limits, and obeyed by them all, certainly so far as such obedience was necessary to constitute it a government. In a word, it was a government which only needed final success in arms to make it, just as it stood, no whit less a government than is now that of the United States. And had the war terminated in a treaty of peace, it would, without any change whatever in it, have been, relatively to the whole world, a permanent government, from its first formation, both in deed and in right.

In the words of Grier, J., delivering a judgment of the supreme court of the United States at its December term, 1862: "Several of these states have combined to form a new confederacy, claiming to be acknowledged by the world as a sovereign state. Their right to do so is now being decided by wager of battle." Prize Cases, 2 Black [67 U. S.] 673. Had the decision been favorable to them, their right would have been established agreeably to their claim. It was adverse; the consequence whereof has been to withhold from their confederate government, ab initio, the character of a government de jure. But, nevertheless, it was a government de facto, relatively to the people under its sway, from the time of its assuming the reins, along with the power, of government over them, and relatively to the rest of mankind, from (at latest) the period of its first recognition as such by the government of the United States.

1. It was at some time or other a government de facto, and whether it had ever been recognized as such by the president, or by the congress of the United States, or not, this United States court in a case properly raising the question (as the present case does) would be bound to decide that it was, upon the facts being established (as in this case they are) that were essential to constitute it such. This proposition no way conflicts with any decision of the supreme court of the United States, although numerous cases have been on the other side cited from the reports of its decisions, as overruling what I thus advance. All of them are distinguishable from it. Most of them relate to foreign states, as to which I need say nothing. Only one of them relates to a state of this Union. Luther v. Borden, 7 How. [48 U. S.] 1. In that case, one of the parties insisted that a circuit court of the United States should try for him a question, whether the government of the state of Rhode Island, holding the power and exercising the functions of government under its ancient constitution, and which was indubitably the de facto government at the period in question, whether (I say) this government had ceased to be de jure such, in consequence of certain unauthorized proceedings of a malcontent party; that precise question having

been already decided in the negative by the supreme court of the state, under a new constitution, which, meanwhile, had regularly superseded all others. And the decision of the supreme court of the United States was, that the circuit court could not try the question for divers reasons. In the first place, it was altogether impracticable for a court and a jury to go through such an investigation; the thing was not feasible. And, in the next place, it was a political question for the state authorities to determine, whose conclusion would be final to the authorities of the Union, subject only to the qualification presently stated, and which, in that particular case, was not adverse; therefore the decision (above mentioned) of the supreme court of the state was binding upon the circuit court, and even upon the supreme court of the United States. In two cases only,—provided for by the fourth section of the fourth article of the constitution of the United States,—was the general government authorized to interfere in the domestic concerns of a state ([Luther v. Borden] 7 How. [48 U. S.] 42), and the nature of the functions then to be performed necessarily referred the decision in those cases to the political, not the judicial, department of that government. But those are not cases involving any question touching the relations of the United States as a government on the one hand, and any state of the Union as a distinct government on the other, inter se. And neither the decision in Luther v. Borden, nor the decision in any other case which has been cited, or is known to me, negatives the right and the duty of an United States court to decide upon the character of such relations, at any rate, if it do not decide counter nor previous decision by the political department. This is agreeable to the rule stated arguendo by Mr. Dana (Prize Cases, 2 Black. [67 U. S.] 665), and in effect affirmed by Grier, J., and the majority of the supreme court (Id. 667) in these words: "As a civil war is never publicly proclaimed, eo nomine, against insurgents, its actual existence is a fact in our domestic history, which the court is bound to notice and to know." Compare Id. 666, 667.

Conformably to this were the decisions made by Story, J., in U. S. v. Hayward [Case No. 15,336], and by the supreme court in U. S. v. Rice, 4 Wheat. [17 U. S.] 246, that Castine in the then district, now state, of Maine was a foreign port, and not subject to the laws of the United States, while, from September, 1814, to February, 1815, it was held as conquered territory by Great Britain, though the political department of our government had not in any way defined its character in that interim. That department of the United States government has never decided that the Confederate States had not a government de facto quite as early as I have any occasion to contend in this case that they had. And, therefore, this court would be bound to hold the affirmative upon that point,

because it is in fact true, even though such department of the government of the United States had never recognized the truth of such affirmative.

2. It has, however, given such recognition by deeds, more emphatic than words, at sundry times and in various ways, and for that reason also the court should hold affirmatively this point. To keep the present discussion within reasonable bounds, I shall select but a few instances thereof.

(1) It has done so by seizing and retaining large amounts of property, real and personal (for example, buildings near this city formerly used for the purpose of a magazine, and gold claimed by the banks of this city), on the ground of their having belonged to the government of the Confederate States; the sole ground on which it could possibly have any right to seize and retain them. And it has afforded such recognition, even more unequivocally, by claiming, as plaintiff in a chancery suit, on the same ground, a large amount of cotton, which it had never seized, but which, having left the port of Galveston before the downfall of the Confederacy, had arrived in England subsequently to that event. This cotton the United States government claimed as their absolute property. The defendant in the suit, on the other hand, claimed a lien upon it by force of an agreement made between him and "the duly authorized agent at Liverpool of the Confederate government" before its downfall. And the court held that the plaintiff was entitled to the cotton, subject to the lien, upon the ground that the government of the Confederate States had been a government de facto, and that, if it had not been so, it would not have been possible that the plaintiff could have any right to the cotton. The judgment pronounced contains a most lucid exposition of the subject, to the whole of which I solicit attention, and especially to the following passages: "Whenever a government de facto has obtained the possession of property as a government, for the purposes of the government de facto, the government which displaces it succeeds to all the rights of the former government, and, among other things,. succeeds to the property they have so acquired." And again: "Although the United States, who are now the government de facto and de jure, claim it as public property, yet it would not be public property, unless it was raised by exercising the rights of government." U. S. v. Prioleau, 11 Jur. (N. S.) pt. 1, p. 792; Id., 35 Law J. Ch. 7. The recognition made in the manner thus instanced was, that the government of the Confederate States had been a government de facto from some indefinite period; and if the government of the United States has not in some mode ascertained definitely the period from which the former was such government, the court must take it to have been from the first moment when it possessed every attribute of a government that it possessed at the last. This was, at latest, from the period of its first getting into complete governmental action. How early that was acknowledged to be the fact by the government of the United States, the cases next to be cited will evince.

(2) In the several cases reported (2 Black [67 U. S.] 635–699) under the collective name of "Prize Cases," the government of the United States recognized that the Confederate States had a de facto government prior to May 17, 1861, the date of the earliest of the captures in those cases, by seizing and causing to be condemned as prize of war, vessels and cargoes for attempted breach of blockade of ports in the Confederate States; but in some of them, the cases of the Amy Warwick and of the Crenshaw, more emphatically, by capturing and causing to be condemned as such prize vessels and cargoes that belonged to residents within the Confederate States, merely because by such residence, in contemplation of law, they were enemies of the United States. For the sake of simplification, I propose to separate these from the rest of those cases, and to confine to them my comments upon the decision of the court, and upon the dissenting opinion of four of the judges. Let me premise, that traitors and rebels, as such, are not in contemplation of law enemies (1 Hale, P. C. 159). And the indifference is not merely verbal, but is attended with most important practical consequences, some of which are pointed out in 6 Bac. Abr. tit. "Treason," G. (Wils. Ed.) p. 516; 7 Bac. Abr. tit. "Treason," (Lond. Ed. 1832) p. 600, and others in 3 Inst. 10, 11. One of these was illustrated upon the trials of the rebels, who surrendered at Carlisle in 1745, and who, it was held, were incapable of making terms of capitulation, as enemies could have done. Townly's Case, Fost. Crown Law, 7, 18 How. State Tr. 348. What has been held in regard to the capitulation of General Lee's and General Johnston's armies in the late Civil War the court knows. Traitors and rebels, so long as they continue to be merely such, can not involve, in any legal consequences of their own guilt, innocent and loyal subjects or citizens, who merely continue to reside at their homes where they were domiciled before the breaking out of a rebellion. But when they become themselves invested with another character, of enemies, whether by substitution for their former character of traitors and rebels, or by superaddition thereto, then they can, to certain purposes, impart their character of enemies, not their character of traitors and rebels, to such (other) subjects or citizens as I have described, and thus expose them, innocent and loyal towards "the parent sovereign" though they be, to loss of their property by capture as prize of war. See Prize Cases, 2 Black [67 U. S.] 693–695.

In a passage of Mr. Justice Grier's opinion in those cases ([Prize Cases] 2 Black [67 U. S.] 673), which was certainly not necessary to the judgment he was pronouncing, and which understood as a link in the chain of his argument, was, I respectfully submit, not conceived and expressed with due caution, it is said: "Treating the other party as a belligerent, and using only the milder modes of coercion, which the law of nations has introduced to mitigate the rigors of war, can not be a subject of complaint by the party to whom it is accorded as a grace, or granted as a necessity." Doubtless. But who constitute "the other party" not entitled to complain of such treatment? The traitors and rebels. They can not complain of being elevated into the more favorable condition of enemies. No such persons, however, were before the court in those cases, either to complain of or to laud the treatment they had received. In the cases of the Amy Warwick and of the Crenshaw, the claimants who were before the court were, on all hands, conceded to be loyal citizens; no way tainted with the guilt of treason or rebellion. These parties had a right to complain, that traitors and rebels infesting their section of the country were, for the nonce, regarded as enemies, with the disastrous consequence to them (the claimants before the court) of rendering their property lawful prize of war, unless in truth they were, in the eye of the law, the law of the United States, enemies, and, moreover, enemies with established government and territorial jurisdiction over them (the claimants). Accordingly Grier, J., in other parts of his opinion, takes pains to show that such was actually the status. In one place, addressing himself (as if would seem) more directly to the captures for attempted breach of blockade, but not without an intuitus towards all the cases then simultaneously receiving judgment, he said: "The law of nations contains no such anomalous doctrine as that which this court are now for the first time desired" by the counsel that argued against the legality of the captures, "to pronounce, to wit, that insurgents who have risen in rebellion against their sovereign, expelled her courts, established a revolutionary government. organized armies, and commenced hostilities, are not enemies, because they are traitors." Id. 670. In another place, speaking of the argument of counsel for the claimants in the cases of the Amy Warwick and of the Crenshaw, he says: "They insist that the president himself in his proclamation admits that great numbers of the persons residing within the territories, in possession of the insurgent government, are loyal in their feelings, and forced by compulsion, and the violence of the rebellious and revolutionary party and its de facto government, to submit to their laws and assist in their scheme of revolution; that the acts of the usurping government can not legally sever the bond of their allegiance," &c., &c. Id. 672. And not denying, but admitting, the truth of these premises, he disproves the conclusion sought to be deduced from them, that therefore the property of the claimants in those cases was not liable to capture as a prize, by bringing forward and applying a principle explained and illustrated at large in Mr. Dana's admirable argument. It is there shown, that the principle and the reasons whereon it is founded are the same in regard to both international and internal wars—(wars as distinguished from mere insurrectionary commotions)—and as to the latter it is said: "The object of the sovereign is to coerce the power which is organized against him and making war upon him. This power exercises jurisdiction and control de facto, and claims it de jure over the territory." Id. 655. "The test is, whether the residence of the owner is under the established de facto jurisdiction and control of the enemy." Id. 658. The words of Grier, J., or rather those of them which seem to me most forcible, to this effect, are found in a passage of considerable length (Id. 673, 674), only the latter part of which I shall quote, for the sake of offering some remarks upon it. "This rebellion," he said, "is no loose, unorganized insurrection. having no definite boundary or possession. It has a boundary, marked by lines of bayonets, and which can be crossed only by force. South of this line is enemies' territory, because it is claimed and held in possession by an organized, hostile, and belligerent power. All persons residing within this territory, whose property may be used to increase the revenues of the hostile power, are in this contest liable to be treated as enemies, though not foreigners. They have cast off their allegiance, and made war on their government, and are none the less enemies because they are traitors."

In using these expressions. Mr. Justice Grier could not have forgotten—what immediately follows them (in the report) evinces that he did not forget—the character which the claimants in the cases of the Amy Warwick and of the Crenshaw were admitted on all hands to bear. And, therefore, he must have intended to be understood as meaning, not that "all persons residing" within the territory described had actually "cast off their allegiance" to the United States, but only that they had constructively done so by reason of the several seceding states having (in his own words) "acted as states" in organizing the rebellion. In other words. that such state action of itself, and without their personal participation. made every man, woman, and child, domiciled within the described limits, an enemy in law, whether loyal or disloyal in fact. This it could have accomplished only by force of governmental authority. Traitors it could by no means make out of such as preserved their individual loyalty, how much soever those may themselves have been traitors, who were

active in thus wielding the de facto power of government. The four judges, who dissented from the decision of the court, held that neither such action of the states, nor any action of the president of the United States, unsanctioned by the previous authority of congress, nor both combined, could invest traitors and rebels with the character of enemies, so as consequentially "to convert a loyal citizen into a belligerent enemy, or confiscate his property as enemy's property." [Prize Cases] 2 Black [67 U. S.] 695. Yet even they were of opinion that an act of congress, approved July 13, 1861, "recognized a state of civil war between the government and the Confederate States, and made it territorial," comprising "Georgia, North and South Carolina, part of Virginia,"—that is, as well as I remember, all east of the Alleghany Mountains,—"Tennessee, Alabama, Louisiana, Texas, Arkansas, Mississippi, and Florida." Id. They, therefore, held that captures "before July 13, 1861, for breach of blockade, or as enemies' property" were "illegal and void" (Id. 699), but they concurred with the rest of the court in holding that such captures, after the date just mentioned, would be legal and valid. And so it has been held in repeated instances since, whether the captures were at sea, as in the cases I have been commenting on, or upon land, as in the case Alexander's Cotton, 2 Wall. [69 U. S.] 404.

All the judges of the supreme court, in all the reported cases, have agreed that to validate such captures, especially of "enemies' property," there must have existed at the respective times of making them, a territorial civil war. This, in the nature of things, could not be without a de facto government of the Confederate States. I pause not to discuss whether civil war could or could not,—because it is absolutely certain that territorial civil war could not,—exist without such government. Then only would exist the condition of things described in the following passage of an able publicist (Bello, quoted in editor's note to Wheat. Int. Law, Bost. Ed. 1863, p. 524): "When one faction or party obtains dominion over an extensive territory, gives laws to it, establishes a government in it, administers justice, and, in a word, exercises acts of sovereignty, it is a person in the law of nations;" and then all persons residing within such territory, whatever their personal predilections or individual conduct, become enemies in law to whomsoever such government is enemy. This alone could have been the ground on which it was held, in the very case of the Amy Warwick, by Judge Sprague in the district court of Massachusetts (whose decree therein was affirmed by the supreme court in the Prize Cases), "that in those states whose state organizations had recognized the Southern Confederacy, all the inhabitants were, as to captures, to be treated as enemies, without reference to their individual action—even where a new state organization, as in Virginia, had been [subsequently] formed and recognized by the federal government as representing the whole state, the senators of which were admitted, as such, into the senate of the United States; the distinction being between citizens of a loyal state, like Kentucky or Missouri, where armed bands might make hostile invasion, and hold divided, contested, or precarious possession of portions of it, and such a state as Virginia, which, by the act of its [then] established government, approved by a majority of its citizens, had placed itself in war with the federal government." Editor's note to Wheat. Int. Law (Bost. Ed. 1863) p. 563. I have somewhat shortened a long quotation, but without (as I think) altering its sense or effect. To render the doctrine of it more accurate, I would suggest an alteration of it so as to make the last clause, instead of "such a state as Virginia," &c. read: "Such a district of country as that part, cis-Alleghany, of the state of Virginia, which had been both, by the acts of its then established government, placed within the Southern Confederacy, and, by the de facto government of the latter, kept and held within its actual territorial limits," in like manner as Castine, with most of the country that lies east of the Penobscot river, had been kept and held, in the war of 1812, under the de facto dominion of Great Britain. In the Prize Cases, the supreme court agreed with entire unanimity, that a territorial civil war, defined by the boundaries I have mentioned, had existed from July 13, 1861 ([Hughes v. Litsey] 5 Am. Law Reg., N. S., 154), the dissenting judges holding that it then first existed (2 Black [67 U. S.] 695, 696); the rest of the court, that it had existed months before, and, at latest, from April 27, preceding (Id. 695). Either date will suit the purposes of my present argument; since the sequestration act of the Confederate congress was approved August 30, 1861, and the proceedings under it, now in question, took place at a still later period.

(3) Other authorities, of divers grades, support the conclusion. that a de facto government of the Confederate States existed and was recognized by the government of the United States; but such of these as I desire to bring to the notice of the court, are authorities also for another proposition, and, therefore, I postpone for the present any mention of them. Under this head I shall further notice only those authorities which the plaintiff's counsel has cited as impugning that conclusion. These are, certain cases of (so-called) pirates; a case of Hawkins v. Filkins [24 Ark. 286]; and a case of Lucas v. Bruce [supra].

i. As to the cases of alleged piracy by cruizing against the commerce of the United States, under commissions granted by the government of the Confederate States to

privateers; no report of them has been produced, nor (I believe) can any be found in this city. The best account of them and of the whole subject, that I have seen, is in Mr. Lawrance's note to Wheat. Int. Law (Bost. Ed. 1863) pp. 246-254. There it appears, that the question being debated in the British house of lords, on May 16, 1861, Lord Derby and all the law lords present, Ex-Chancellor Brougham, Ex-Chancellor Chelmsford, the then chancellor, and Lord Kingsdown, formerly distinguished at the bar and as one of the judicial committee of the privy council, under the name of Mr. Pemberton Leigh, delivered their clear opinions, which no one gainsaid, that such privateering by citizens of the Confederate States would not be piracy jure gentium. See, also, Id. 643, 647, 778, note. And this seems to have been Mr. Justice Nelson's opinion upon the trials at New York before him, in which, it is observable, no conviction took place. In the trials at Philadelphia, before Mr. Justice Grier, four individuals were convicted, but none of them were sentenced; so that, practically, the doctrine was never enforced, that such privateering was even piracy against an act of the congress of the United States. Both of those judges seem, indeed, to have held that it was; but upon what ground either of them was of that opinion, I have not been able to learn. Possibly they may have held, that no valid commission could be granted to privateers, at least as against that act of congress, unless by a government de jure; for privateers, in depredating upon the commerce of citizens or subjects of the parent sovereign, have this in common with robbers, that whatever either of them perpetrate is perpetrated causa lucri. Certainly there appears, in all that I have seen concerning those trials, nothing like an intended negation of the palpable fact, that .the Confederate States had a de facto government at an early period in 1861; though possibly not complete, in all the attributes of such a government, as early as the date of the commissions to those privateers, the precise date of which I have not been able to discover. These cases, therefore, present a very feeble opposition (if they present any) to the conclusive array of authorities, which I have already marshalled and shall in the sequel enlarge.

ii. In the case of Hawkins v. Filkins [supra], it is true, Batlett, J. (of a circuit court in Arkansas), is reported to have held that the late government of the Confederate States had never been a government de facto; but this was altogether an extrajudicial opinion, and therefore not an authority. The question before him was, whether, after the downfall of the Confederate States, an execution could issue upon a judgment of a court, which court itself fell along with the Confederacy. This was a point too plain to admit of any doubt; for

it is clear, that a government de facto,—one that is merely such, and not also de jure,—can not impart, what after its own extinction will be a continuing enforceability, to judgments, decrees, or sentences, which then remain unexecuted. And the judge actually put his decision, rightly, upon this ground, so that what he said afterwards, upon the other point, was a mere gratis dictum.

iii. The case of Lucas v. Bruce [supra], contains not even so much as a gratis dictum, distinctly put, in opposition to the doctrine I maintain. The real ground of the decision in it is stated by the judge himself, in these words: "The doctrine of belligerent rights gives no power to the enemy to take, with impunity, the property of a citizen or subject of an invaded country; no sovereign power, even acknowledged by all the world, can give such authority." And this seems to be true, with reference to such a case as then was before the court; in which damages were sought to be recovered for first taking possession of, and afterwards destroying, the plaintiff's buildings,—acts, not in accordance with the lawful usages of what is technically called just war, but in plain violation of them. Nor does the judge there cite, as authority for anything beyond this, the South Carolina case of Whitaker's Adm'r v. English, 1 Bay, 15. Moreover, that case is, in truth, good authority for nothing. It was a mere jury-trial, before a single judge, as early as April, 1784, of an action against one of the South Carolina tories; against whom, as we know from history, the most intense and sublimated hate, for their loyalty towards "the parent sovereign," was at that period and long afterwards cherished as a laudable feeling by the triumphant party. The defendant, whose misfortune it was to fall at such a time into such hands, had very small chance of justice. And certain it is, the law was wrested—I do not say corruptly wrested—against him. Possibly what he had done, by command of his superior officer, in taking private property for the use of the British army, no part of which had been appropriated to his own emolument, might have been indefensible, for the same reason as was the tort which was complained of in the case of Lucas v. Bruce; but that point was not at all noticed; and, without any inquiry concerning it, the jury were, in effect, instructed (doubtless the result would have been the same, if they had been merely permitted) to find against the defendant; notwithstanding he claimed the protection of the late treaty of peace. The judge held that that protection extended only to criminal prosecutions, not to civil actions; directly contrary to the decision of a more respectable tribunal in New York, in the case of Rutgers v. Waddington, reported by General Alexander Hamilton, who was counsel in it (1 Am. State Papers, Foreign, Bost. Ed. 1819, 369, 370), and stated, with approving com-

ments, in Mr. Jefferson's letter to Mr. Hammond (Id. 293–295; 3 Jeff. Works, New York Ed. 1856, 403, 404).

II. As, in civil war, all persons residing under the established jurisdiction and control of a de facto government are liable to be treated as enemies in law to the government de jure; so the same persons are entitled to perfect legal immunity for whatever they do, during such war, in support of, or in obedience to, much more when it is done by compulsion of, the de facto government over them, provided only the thing done be not contrary to the lawful usages of just war.

1. I have demonstrated at large, to the entire satisfaction of the plaintiff's counsel, as avowed in his reply to my oral argument,—and therefore I shall not here repeat the steps of the demonstration,—that according to the common law of our transatlantic ancestors, respected and observed from time immemorial, except by the Yorkists under Edward the Fourth at the commencement of his reign, and which, on account of that deviation, was re-asserted by parliamentary declaration (11 Hen. VII. c. 1) in 1494, since which time there has never been in England even so much as an attempt to depart from it, the partisans and adherents of a king de facto, for their support of him against a competitor who, by prevailing in the struggle, establishes his claim to be king de jure, can not be punished as traitors: And that, as this doctrine is founded upon the most solid reasons, which are even more applicable among us in America, than ever they were among our ancestors in England; so the doctrine itself is entitled to be here, even more than there, considered sacred and inviolable. Every reason which exists there (as displayed in Bac. Gov., Lond. Ed. 1739, pt. 2, p. 144, and in 4 Bl. Comm. 77, 78), exists also here; with this intensification of that one, which springs from the people's inability to determine which is the de jure government,—at least as of the time preceding the close of our late Civil War,—that the very structure of our complex system of federal and state governments has, through a long period, led the most acute political reasoners and the best informed statesmen among us into differences of opinion, touching the right of secession, as sincere as they were irreconcilable. What has been settled respecting it by "wager of battle," to use Mr. Justice Grier's expression,—for the time to come,—is now perfectly well understood. But heretofore very many persons in all the states, more especially during late years in the states of the South, were convinced that a majority of the people of any state, through a majority of regularly delegated deputies in convention, had a right to withdraw their state from the Union of the United States, and that, if the government of the United States made war against such seceding state for that cause, it would be a war without the shadow of justification. Others, in great number, believed that if any state seceded in the manner I have just described, although it would afford cause of war to the government of the United States, just or unjust according to the nature of the occasion which led to such secession, yet the citizens of the state would owe their primary allegiance to it, and, by faithful adherence to such allegiance, could only become enemies, never traitors, to the government of the United States. Perhaps a majority of the people of the Southern States held, as an article of their political faith, the former of these doctrines; almost all the rest of them held the latter. And even the supreme court of the United States, in the very heat and fervor of the civil war, in the same sentence wherein they declared "the citizens owe supreme allegiance to the federal government," yet added, "they owe also a qualified allegiance to the state in which they are domiciled;" with a most pregnant addition in the next sentence: "Their persons and property are subject to its (the state's) laws." Prize Cases, 2 Black [67 U. S.] 673. Such having been our peculiar political relations, and such the diversities of honest opinion concerning them, it surely can not be doubted, upon calm reflection, now, when the passions excited by the war have in a good degree cooled down, that after the seceding states had established a de facto government of the Confederate States, and after it had assumed steadily the reins, with the power, of actual government, the citizens subjected to its sway could not, by voluntarily supporting it, become traitors or rebels against the government of the United States. Whether those who brought about a secession of any of the states were guilty therein of treason, and, if they were, whether the subsequent establishment of a de facto government of the Confederate States purged away that guilt, are questions with which no purpose of my present argument requires me to meddle. The defense I am here to maintain is unembarrassed with doubts or difficulties of that nature.

2. Immunity for acts done, in support of, or in obedience to, such de facto government, by citizens of the Confederate States, during the Civil War, and according to the lawful usages of just war, extended, not only to public prosecutions of the government of the United States, but also to private suits of citizens of the latter. This point was decided, while the war was still being waged, in a court of the loyal state of Kentucky, then under the ligeance both de facto and de jure of the United States. The case—Hughes v. Litsey [supra]—was as follows: The plaintiff alleged that, in July, 1862, the defendant and a number of other persons, banded together for the purpose of making war upon the government of the United States, came into the county of Washington, Kentucky, and took from the plaintiff two mules and harness and a wagon, with an averment that the same were taken by the

defendant and the others aforesaid to be used, and were used, to haul and carry guns and ammunition belonging to said band and used by them in executing their common purpose aforesaid. Prima facie this, indubitably, was a good cause of action; for such seizure by traitors and rebels would have been an indefensible trespass. But the court held that a good defense was presented by the plea, which stated, "in substance, that before and at the commencement of the present civil war the defendant was a citizen and resident of the state of Texas, which state, by an ordinance of secession, withdrew from the government of the United States, and, with other seceding states, formed the so-called Confederate States of America, declared their independence, and appealed to arms in support of that declaration; that at the time of the adoption of the ordinance of secession, and ever since, the state of Texas, to which he owed allegiance, has had the civil and military power to enforce the ordinance of secession and compel all her citizens to obey the laws or orders of that state, and that the federal government did not and could not protect him in refusing obedience to the laws or orders of the state of Texas; that, in pursuance of the civil and military orders or laws of that state, he was a private soldier organized into the army of the so-called Confederate States, and, together with about eight hundred others, marched by their military officers into the state of Kentucky; and that, in the prosecution of a public war between the so-called Confederate States and the United States, some portion of the Confederate army to which he belonged may have taken the property of the plaintiff, but the defendant himself did not take, or advise, or aid, or assist in taking it."

Upon this plea—every part of which, material to raise the general question here discussed, is averred quite as strongly in the answer in the present case, and not denied, —the court remarked: "It can not be doubted that, as a general rule of law, all persons who voluntarily join in an illegal undertaking are responsible for all injuries done by any of them in carrying out the common design; and it will be observed, that the defendant does not expressly aver that he was compelled against his will to join the Confederate army." Therefore, in conclusion of its comments upon the plea, the court said: "The question now presented for decision is, whether the rights or laws of war so apply between the two contending parties as to exempt the defendant from liability in a civil court for the injuries done to the plaintiff by the soldiers of the so-called Confederate States with whom he was united and co-operating." And this question the court decided in the affirmative; delivering an elaborate, very learned, and thoroughly reasoned opinion, in the course of which it was remarked

that, according to the opinions of all the judges of the supreme court, the Civil War had existed from July 13, 1861, anterior to the date of the trespass, or alleged trespass, complained of. This was deemed absolutely conclusive; and for the declared reason, that thenceforth a de facto government of the Confederate States must be taken to have existed, and moreover to have been recognized (as existing) by the government of the United States. See Hughes v. Litsey [supra]. The right of a loyal citizen to his private property was in that case invaded, without a possible justification or excuse, if the defendant was a mere traitor and rebel, or if he was acting under authority from mere traitors and rebels set over him; no such compulsion by brute force having been even pretended, as is described in a passage relied upon by the plaintiffs' counsel for another purpose, and which will be presently quoted from Lucas v. Bruce, 4 Am. Law Reg. (N. S.) 96, 97. Had the Confederate army been invested with no other character than such as belonged to the Western insurgents in 1794, the plaintiff must have recovered. And the government of the United States could not have taken away from him the right so to recover, by their "according as a grace" ([Prize Cases] 2 Black [67 U. S.] 673), any other character to the Southern "belligerents." As against him it was indispensable, that such other character should have been "granted as a necessity" (Id.), that is to say, as necessarily resulting from law, and that a law binding upon the local tribunals of the state of Kentucky; for the suit was instituted, as the court more than once pointed out in a tribunal of the state, not the United States. Such modification of the local law could be only by the proper authority, wielding control over the state's external relations, having recognized (in a manner obligatory on its citizens) the Confederate States as an existing and hostile de facto government; or (which seems to be the more correct view) by the veritable fact, whether the same had or had not been so recognized, that there was at the time such existing government, engaged in actual hostilities with the United States. A similar remark, in substance, has been before made with reference to the right of the United States to capture effects of citizens whose sole offense consisted in residing under the established de facto jurisdiction and control of the Confederate States government; it now receives a more striking illustration, from this decision that the government just named could validly authorize its soldiers to capture effects of loyal citizens on the northern side of the "boundary marked by lines of bayonets," (Id. 674), provided only that it were done in accordance with the lawful usages of just war between independent nations.

3. A fortiori what was done under compulsion of the de facto government of the Con-

federate States was entitled to like immunity, within the limits of the proviso just now stated. To things of this class, more emphatically, the following extract from an opinion of the present attorney-general of the United States, given at the requisition of the government, upon perhaps the most important occasion that has ever called forth an attorney-general's opinion is applicable. This document, manifestly, was prepared with a caution and carefulness corresponding with the occasion. And in the course of it Mr. Stanbery says: "When an insurrection, by its continuance and power, takes the form of a de facto government, and prescribes and enforces laws over people within its territories, individual rights and obligations undergo an inevitable modification, and the rightful and displaced authority, when it again comes into place, must, in a measure, accommodate its action to circumstances, and consider many things as rightfully done, which, in a mere insurrection, would have no color of legality,"—doctrine, by the way, though perfectly correct, yet utterly foreign from the purpose, unless the attorney-general was satisfied, as doubtless he was, that the late government of the Confederate States had been a de facto government, and moreover that it had been such in the contemplation of the present congress; for it was applied by him towards ascertaining what they meant in a statute recently passed.

III. It follows, that, the dividends in question having been paid under compulsion of the late Confederate States government, that fact is an absolute bar to the demand set up in this suit.

1. They had been paid, before the downfall of that government, and by compulsion of it; in that sense of compulsion, which is sufficient to maintain this defense. The passage cited by the plaintiff's counsel from Lucas v. Bruce [supra], is inapplicable. It is there said: "There is no doubt, if persons are compelled by a power not to be resisted, and which is immediately applied, they will be excused for what would otherwise be a trespass on their part. But this force must be upon the person, and it must be an actual compulsion that can not be resisted, and have continued all the time. They must have joined 'pro timore mortis et recesserunt quam cito potuerunt.'" No doubt this is so, where the compulsion is that of mere brute force, without any mixture of governmental authority, and is set up as an excuse for doing what, as it is said in the same case, "no sovereign power, even acknowledged by all the world, can give authority" to do. Id. 98. Here the compulsion was by governmental authority, which could not with impunity be resisted; and it was to do what a government de facto had authority to command, provided it were done (as in this case it was) before such authority became extinct by the downfall of the government itself.—For

2. A de facto government, cheerfully supported by the majority of the people subject to it, can not have less of governmental authority over all so subject, than an usurping conqueror has, to whom the people of the country reluctantly submit. An eminent jurist, indeed, has already suggested a parallel between them. "When," says he, "the people of a republic are divided into two hostile parties, who take up arms and oppose one another by military force, this is civil war. 'Supposing that the rebellion is but partially successful, and the old government maintains itself in one part of its territory, whilst it is obliged to surrender another (temporarily), shall it then give law where it has no power to enforce obedience, or shall its authority be (for the time) confined to the territory which it occupies? A revolutionary party, like a foreign belligerent power, is supreme over the country it conquers, as far and as long as its arms can carry and maintain it." Opinion of Black, Atty. Gen. U. S., May 15, 1858; quoted in editor's note to Wheat. Int. Law (Bost. Ed. 1863) p. 575. In truth a conqueror, after he has become (in the language of publicists) a regent, does exercise, in propriety of speech, government; which, while his usurpation continues green, is only de facto, but may, by long-continued possession, ripen into government de jure. This change, of a mere conqueror into the established regent of a country (3 Phil. Int. Law, 690, 691), may be effected "by the submission of the conquered people to the new government, indicated, either by some public act of the state, or by the fact itself, evidenced by the tranquillity of the people (under the government of the conqueror regent), their obedience to the laws (of his enforcing), and, above all, by the quiet administration of justice (under his rule) in the proper civil tribunals,"—circumstances, whereof every one existed, in combination, to fix upon the late government of the Confederate States the character of a de facto regent, or regnant power.—And

3. If the dividends in question had been paid under the authority of an usurping conqueror, in like manner as they were paid under authority of the late Confederate States government, such payment would have been a sufficient defense against the demand set up in this suit. I take this method of making good our defense, by arguments a pari if not a fortiori, from doctrines which are established; because such has been our former felicity, that heretofore the precise question has not, for want of occasion, received a solution among us, and, in the civilized countries of the old world, the de facto governments, that have occasioned similar questions, have been those which were founded on conquest.

(1) Let us examine the doctrine established in regard to debts. These are quoad hoc of two kinds; public, or due to the state; and private, or due to individuals: And I am

necessitated to notice them both, and in this order, because my author first expounds the doctrine as to public debts, and then applies the same to private.

i. After stating that, "if the debts due to a state be actually situated in the country of which permanent possession is taken and over which an imperium is exercised, it is clear that, if these debts are actually collected from the debtors, they fall within the imperium of the conqueror;" Dr. Phillimore says: "Assuming that the conquest has subsided into government, the conqueror been changed into the regent, and yet that after a lapse of time the former sovereign and the former government return, and, having returned, claim at the hands of their debtor the payment of the debt, which he has discharged during the interregnum to the sovereign or government de facto; does it follow that, if this (de facto) sovereign and government had the right to exact the debt, it was the debtor's duty to pay it? Are the two propositions convertible? Or, if so, may not the original creditor demand a second payment?" And, having put these questions, he thus answers them: "Bynkershoeck says, that the debt is satisfied and extinct. And such is unquestionably the opinion both of the greater number and of the most able jurists; such is the conclusion from many analogies of the Roman law; such is the language of treaties." He then subjoins: "But in order to arrive at this conclusion of law respecting the extinction of the debt paid by the state-debtor to the executive authority de facto of the state, founded upon conquest, certain conditions are required by reason, justice, practice, and the analogies of positive, especially Roman, law. These conditions are as follows:—1. As a general rule, the public authority, to which the debt is paid and from which a receipt is taken, should be that to which the country is actually subject at the time of the payment; it must, as has been said, be the established authority of a regent grafted upon the bare right of a conqueror.—2. If, however, the payment be made to a mere conqueror, it may nevertheless be valid; but then a burden of proof lies upon the debtor to show—(1) That the sum was actually paid;—(2) that it was due at the very time it was paid;—(3) that the payment had not been delayed by a mora on the part of the debtor, which had thus operated to defeat the claim of the original creditor;—(4) that the payment had been compulsory,—the effect of a vis major upon the debtor,—not necessarily extorted by the use of physical force, but paid under an order the disobedience to which was threatened with punishment;—(5) that the constitutional law of the state recognized the payment to the conqueror as such,"—to wit, as payment; that is to say, that the payment to the conqueror was so made as that by the fundamental law of the state it would have been a valid payment, if made in like manner to the government de jure (for it is mere absurdity to talk of the constitutional law of any state providing for the payment to a conqueror "as such," to wit, as conqueror, of debts due to the state);—or, in the terms of Hallack's paraphrase, "that the constitutional law of the state recognized the payment, as made by him (the debtor) to be valid; in other words, that it was made in good faith, and to the de facto authority authorized by the fundamental laws to receive it." 3 Phil. Int. Law, 693, 696–698; Hall, Int. Law, c. 32, §§ 27, 28. Whatever the true construction of this fifth requisite may be, certain it is, it must be such as can consist with the main proposition to which it is incident—that "payment made to a mere conqueror may be valid."

ii. In a subsequent part of his work, Dr. Phillimore says: "The question as to the right to confiscate the public debts of a state has been already discussed; and, generally speaking, the principles relating to this subject are the same as those which relate to the confiscation of private debts. It has been stated, in an earlier part of this volume, that the right of confiscating the private debts of an enemy is a corollary to the right of confiscating his property. That, however rigorous and inexpedient the application of this summum jus may be, it is nevertheless competent to an enemy to exercise it. That this position is supported by the reason of the thing, and by the authority of jurists and judges on the continent of Europe and in the United States of North America. Nevertheless," he continues, "in 1817, the English court of king's bench made a decision wholly at variance with these authorities." He then states, and remarks upon the case of Wolff v. Oxholm, 6 Maule & S. 92–106; and concludes his strictures by saying (inter alia): "The decisions of the American, Dutch, and German courts (none of which, strange to say, were quoted), appear much sounder; and perhaps, if the occasion should present itself, the decision of Lord Ellenborough (therein) might be reversed in England." 3 Phil. Int. Law, 720–725. The American authorities to which he refers are the opinions of the judges in Ware v. Hylton, 3 Dall. [3 U. S.] 199; and Judge Story's opinion in Brown v. U. S., 8 Cranch [12 U. S.] 139–143, wherein one other judge expressly concurred with him, and which is not impugned by the contrary judgment of the majority, founded on another and wholly distinct ground. To these might have been added Mr. Jefferson's vindication of the same doctrine, on which (furthermore) our ancestors practiced in the war of the Revolution. 1 Am. State Papers, Foreign (Bost. Ed. 1819) 261; 3 Jeff. Works (New York Ed. 1856) 369. And accordant with Phillimore's condemnation of the decision in Wolff v. Oxholm is Wheaton's and also Halleck's disapproval of it. Wheat. Int. Law, pt. 4, c. 1, § 12; Hall. Int. Law, c. 15, §§ 17–20.

(2) Even more favorable to the defense is the real case, than if the dividends in question had been debts due to the plaintiffs. In truth they were in the nature of income from permanent property; namely, shares of the capital stock of a company, whose railroad was located wholly within the Confederate States, to wit, in Virginia, east of the Alleghany mountains, and in North Carolina. The case is, therefore, analogous to that of real estate; concerning which, we are told: "In cases where the income of the estate would otherwise be sent out of the country to augment the resources of either the public or private wealth of the enemy, it may be sequestrated during the pendency of the war." 3 Phil. Int. Law, 135. Here it was not confiscated, but sequestrated in the very terms of the act of the Confederate congress, set out in the answer. And, as also stated therein, the stockholders, in their first general meeting after the close of the war, unanimously resolved that the sale of the sequestrated stock by order of the Confederate States government (through its judiciary) should be regarded as a nullity from the time of the downfall of that government. But the dividends which accrued during the war, and were actually paid during the war, under compulsion; these the stockholders think that the company should not a second time be compelled to pay.

The counsel for the plaintiffs argued, indeed, that compulsion can not be practiced upon a corporation. But, however true this may be concerning such compulsion as is necessary for excusing from the consequences of an act, which otherwise would be tortious, and which no governmental authority could sanction; it is not true concerning that species of vis major, which, being brought to bear upon a debtor (corporation or individual), without physical force, is sufficient to render valid even a payment to the conquering, though not yet regent, power. "An order, the disobedience to which was threatened with punishment," suffices for this; and in our case there was such order, accompanied from its very nature with such threat. The corporation was not bound, before it rendered obedience, to wait for a distringas to be laid upon its effects, with the ruinous consequences of such a proceeding against a railroad company. Nor was its president or any other officer bound to subject himself to process of contempt from the court, or himself or the company to the very severe penalties menaced in the sequestration act of the Confederate congress. Besides which, the de facto government of the Confederate States being, not a mere conquerer, but (for the time) an established regent, even a voluntary obedience to it would entitle to complete immunity.

IV. But should the court not sustain that defense, to which all the foregoing propositions relate,—at any rate the plaintiffs are not entitled to recover more than the value of the

dividends at the time they were demanded; that is to say, the value thereof after the close of the war; at which time the currency (to wit, Confederate States treasury notes), wherein the dividends had been earned, declared, and paid to every stockholder that received his, had become of no value.[2] And for want of a demand, which admitted of payment in that medium or of that value, before this suit was brought, the suit ought to be dismissed.

1. Dividends, in their nature, do not constitute (in any proper sense) a debt from the company to the respective stockholders, at least until payment of them has been demanded and refused. They are the quotients of the gains made, which, in a division thereof, fall to the share of each stockholder, in proportion to his amount of stock, and it is his business to come forward and get his share, not that of the company to seek him and pay it. The company therefore is a mere depository for him after a dividend is declared (as it was for all the stockholders before), and bound to no more or other duties in his favor quoad his dividends, than any other bare depository would be;—not his debtor, at least before it has failed to meet his demand for payment thereof; and when it has so failed, it is at most his debtor thenceforth, not with a relation backwards to the time past. These conclusions are sustained, both by principle and by the authority of decided cases. King v. Paterson & H. R. R. Co., 5 Dutch. [29 N. J. Law] 82, stated in 22 U. S. Dig. 141, pl. 59–62; and State v. Baltimore & O. R. Co.; 6 Gill, 363, 387, 388.

2. The company, being such depository, was neither bound nor even at liberty to convert the Confederate State treasury notes it held for each stockholder into any other form of circulating medium, or into any other description of property. Suppose a stockholder had received his dividend in such notes, and then deposited the same with a mere bailee to keep for him; it surely will not be pretended, that the depository thus constituted could be bound to do more than return

---

[2] This precise point in respect to dividend of a bank, declared during the war, and not claimed until after it was over, was decided by Judge Parker, upon full consideration. See transcript of record of the case before him, filed with Brent's answer in the suit of Merchants' National Bank v. Valley Bank [Case No. 9,447], pending in this court, wherein his reasons for the decision are given. And such was his opinion, though he held in the same case that the Confederate States treasury notes, deposited generally, would create the relation of debtor and creditor between the bank and the depositor; in opposition to which it was then contended, and is to be hereafter contended in the suit above mentioned in this court, to wit, that if those notes had in themselves the indicated vice no transaction based on them would create an indebtedness. This doctrine I am to oppose in that case, and if I am to be beaten upon it there, then I claim the benefit of it here for the Petersburg Railroad Company, which for other reasons would owe the plaintiffs nothing.

the same notes upon demand. Let them appreciate, or let them depreciate, it would no way concern him, to gain in the one case, or lose in the other. And the case must be the same with the company.

3. Which being so, the present suit can not be maintained at all,—not even to recover the Confederate States treasury notes,—for want of a previous demand, admitting of satisfaction by payment of them, or of their value when such demand was made. 6 Gill, 363, 387, 388. The principle is the same as in the case of a factor (as to which see Cooley v. Betts, 24 Wend. 203); or in the case of an executor in respect of a legacy (concerning which see Miles v. Boyden, 3 Pick. 213); or rather the defense is (if any difference) stronger in this case than in those.

In conclusion, I respectfully crave indulgence for the defects and imperfections of this note by reason of the present disorder of my health; confidently trusting that, whatever faults of expression may be found, a candid consideration of the several parts will, without difficulty, make of them a consistent whole.

CHASE, Circuit Justice. This is a suit by the administrators of a stockholder of the Petersburg Railroad Company, who was a citizen of Pennsylvania, and resided in the city of Philadelphia during the late Rebellion, to compel that corporation, created by the statutes of Virginia and North Carolina, and having its principal office for business at Petersburg, to account for dividends declared by the company during 1861, and subsequently before the filing of the bill on November 22, 1866.

According to the statement of the answer, admitted to be true by written stipulation of counsel, Catharine C. Keppel, before the Rebellion, was the owner of two hundred and three shares of the company's stock, and subsequently, by further issues of stock, became entitled to one hundred and one additional shares, making a total of three hundred and four shares.

After the secession of Virginia, and organization of the Southern Confederacy, the company submitted, without opposition, to the control of the Confederate government set up over North Carolina and that part of Virginia in which the road lay, in hostile exclusion of the constitutional authority of the United States. Subsequently, on August 30, 1861, the Confederate congress passed an act for the sequestration or confiscation of all property found within the rebel states belonging to loyal citizens of the other states of the Union.

Under this act, such proceedings were had by a district judge holding a court under the pretended authority of the Confederate government, and by a receiver appointed by him, that ninety shares of Mrs. Keppel's stock were sold to sundry purchasers, and dividends were paid on the whole number of shares, partly to these purchasers and partly to the receiver.

These dividends amounted to one hundred and nine per cent., and were paid at different times from July, 1861, to November, 1864, inclusive. After the overthrow of the Confederacy, the sales made by the receiver were treated as nullities by the railroad company. Script for the one hundred and one additional shares was sent to the complainants, as administrators, and if dividends had been subsequently declared, payment would have been made to them in the whole three hundred and four shares.

It appears from this statement that the company itself regarded the confiscation act as null and of no force, so far as the sales of the ninety shares were concerned. That sale was treated as a nullity, and the title of the purchasers under it as worthless. But the company claims—1st. That payments of dividends, made under the same act, to the receiver and the purchasers, must be upheld as valid payments; and 2d. If this claim be disallowed, then that the liability of the company was only to pay, on demand, the dividends of Mrs. Keppel, in such currency as was necessarily received, and no demand having been made except by the commencement of this suit after that currency had become wholly worthless, no decree can now be made against the company.

The first of these propositions rests upon the premises that the Confederate organization was a government de facto, and that acts in obedience to its authority must be presumed to have been done under the compulsion of superior force, by reason of which the actors are discharged from all ulterior responsibility. Of this it may be observed, in the first place, that the term de facto, as descriptive of a government, has no fixed and definite sense.

It is, perhaps, most correctly used as signifying a government completely, though only temporarily, established in place of the lawful or regular government, occupying its capital and exercising its power. Examples of this kind of de facto governments are found in English history; some in the violent seizure and temporary possession of royal power, and one, so conspicuous that the world can never lose the sense of it, in the establishment of the commonwealth and the protectorate in place of the monarchy.

In this sense certainly, the rebel government was never a de facto government. It never held the national capital. It never asserted any authority to represent the nation. It was only what it professed to be, a revolutionary organization, seeking to establish a Confederacy of states, disconnected from the United States, and dependent wholly for success upon the success of the revolution.

The term, however, is often used, and perhaps more frequently, in a sense less precise, as signifying any organized government established for the time over a considerable

territory, in exclusion of the regular government. A de facto government of this sort is not distinguishable in principle from other unlawful combinations. It is distinguishable in fact mainly by power, and in territorial control, and by the policy usually adopted in relation to it by the national government.

Treason in England is not committed against the lawful government by acts of hostility done in support of a de facto government, strictly so called. This is the rule established by the statute 11 Hen. VII., passed with reference to the frequent changes in the royal authority during the civil wars of York and Lancaster.

And the reason of the rule, doubtless, extended to acts done under the parliament and the protector, while in possession of the supreme authority in England; though the benefit of it was denied to many, and in a most conspicuous instance to Sir Henry Vane. And it may be well doubted whether in this country treason against the United States could be committed in obedience to a usurping president and congress, exercising unconstitutional and unlawful power at the seat of the national government.

But it can not be maintained that acts against the king committed in obedience to a usurper temporarily in possession of a part of the kingdom, would not be treason in England; or that levying war against the United States by persons, however combined and confederated, (even though successful in establishing their actual authority in several states), would not be treason here.

What effect, then, is to be given to acts done under the authority of an insurgent body, actually organized as a government, and actually exercising the powers of a government, within a large extent of territory, not merely in hostility to the regular and lawful government, but in complete exclusion of it from the whole territory subject to the insurgent control? It is not easy to give a general answer to this question. On the one hand it is clear that none of its acts in hostility to the regular government can be recognized as lawful; on the other, it is equally clear that transactions between individuals, which would be legal and binding under ordinary circumstances, can not be pronounced illegal and of no obligation, because done in conformity with laws enacted or directions given by the usurping power. Between these extremes of lawful and unlawful, there is a large variety of transactions to which it is difficult to apply strictly any general rule; but it may be safely said that transactions of the usurping authority, prejudicial to the interests of citizens of other states excluded by the insurrection and by the policy of the national government from the care and oversight of their own interests within the states in rebellion can not be upheld in the courts of that government.

In the case before us. for example, Mrs. Keppel was the undoubted owner of three hundred and four shares of the stock of the Petersburg Railroad Company, and was clearly entitled to her just proportion of its earnings. But she was denounced as an alien enemy by the Confederate government. She was excluded from all control of her stock, and all receipt of dividends. And more than this, the stock was sequestrated, or rather confiscated, and partly sold, and the dividends paid to the purchasers, and to a person called a receiver, appointed under the rebel authority. Can it be maintained that her right to the dividends upon her stock was defeated by these transactions? We think not. We can not regard the Confederate government as a de facto government in any such sense that its acts are entitled to judicial recognition as valid. On the contrary, we are obliged to regard it as a combination or unlawful confederacy organized for the overthrow of the national government, and its acts, for the confiscation or sequestration of the private property of the citizens of the United States, as null and of no effect. The appointment of the receiver, the sales of the stock, the payment of the dividends, must all be regarded as part of the process of sequestration or confiscation, and all as equally void.

But it is said, admitting the character of the Confederate government, in view of the law, to be such as has been stated, that the company was compelled to pay the dividends to the parties who received them, and by this compulsory payment was discharged of responsibility to the lawful proprietor of the stock.

This proposition. asserts the exemption of the company from liability on the principle vis major: that there can be no responsibility where the loss is occasioned by irresistible force. And it may admitted that if the dividends belonging to Mrs. Keppel had been set apart to her especially, and the money thus set apart had been taken from the officers of the company without consent on their part, by the application of force, either actual or menaced, under circumstances amounting to duress, the loss must have been borne by her. After such an appropriation of dividends, the company would have become, perhaps, the bailee of the stockholder for her proportion, and an excuse which would avail a carrier for hire for non-delivery, might excuse the company for non-payment.

But we cannot agree that this rule is fairly applicable to this case. It does not appear that there was any setting apart of dividends, or that any force was actually used or threatened. On the contrary, the action of the company in employing their railroad in the service of the Confederate government, and the absence of any protest on the part of any of its officers against the unlawful payment of the dividends, afford a reasonable inference that they were not involuntary accessories to the whole action of that government. No reasonable application of the prin-

ciple relied upon, therefore, will excuse the company from its liability to its stockholders. And public policy clearly requires the protection of stockholders in the loyal states from any application of this principle not clearly demanded by the law. Mrs. Keppel was deprived of the immediate security, afforded to her rights by the national government, by the Rebellion. It is the duty of that government, since that Rebellion is suppressed, to afford her, as far as practicable, ultimate security. On the other hand, it is the obvious dictate of sound policy that no encouragement should be given to rebellion by relieving parties within rebel control of private responsibilities, except in very clear cases of compulsory force, without their direct or indirect consent.

We think the second claim of the company as to payment in Confederate notes equally untenable. The liability of the company to Mrs. Keppel for each dividend accrued when it was declared. At that moment the company became debtor, and the stockholder creditor, for the amount. It may have been the fault of neither that payment was not then made.

It was not, certainly, the fault of the stockholder. It is no excuse to the company that the particular currency in which its income was received, and in which its dividends were paid to the stockholders, has since become worthless. The dividends were declared in dollars. The debt created by the dividend to the stockholder was due in dollars. And in dollars only can it now be discharged.

But we are not more ready to say that it must now be discharged by dollars of greater value than those in which it was received, than to say that it may be discharged by dollars of no value at all. At the time several of the dividends were declared, the chief currency, and when the others were declared, almost the entire currency of that part of the country in which the railroad was operated, was in Confederate notes; and whatever currency of bank notes there may have been in circulation, was of no greater real value. This currency may fairly be said to have been imposed on the country by irresistible force. There was no other in which the current daily transactions of business could be carried on, and there could be no other while the rebel government kept control of the rebel states. The necessity for using this currency was almost the same as the necessity to live. No protest, no resistance, no rejection, could avail anything. At the same time, this currency, though it depreciated rapidly, had a sort of value. Its redemption, though improbable, was not impossible, and, until the downfall of the Confederacy, it had a greater or less degree of purchasing power.

Under these circumstances, we can not refuse to take notice of the fact that the dollars which the company received were not of either description of dollars recognized as lawful money by the laws of the United States; nor can we hold the officers of the company as incurring any liability to the stockholders by receiving the currency actually in circulation for its earnings, beyond that of prompt payment in like currency to such stockholders as were in a situation to receive such payment; and payment as soon as practicable in currency of equivalent value to such as were resident in the states, intercourse with which was, at the time, not only cut off by the Civil War, but was also interdicted by the congress of the United States.

In the case of Shortridge v. Macon [Case No. 12,812], it was held that the accrual of interest upon a note for a certain sum and interest was not suspended by the Rebellion. The dividends, in the present case, are in a different predicament. Dividends are only payable on demand, and it is agreed in this that there was no demand until the filing of the bill. Interest, therefore, can only be allowed from that date.

We shall decree, therefore, that the respondents pay to the complainants the dividends declared upon the stock of their intestate, with interest from November 23, 1866. The amount of the several dividends at the several dates when made, will be computed by deducting such percentage as will reduce them to equal value in lawful money, and interest on the aggregate amount will be cast from November 23, 1866, to this date, at six per cent.

And decree will be entered for the sum thus ascertained. The computations may be made by the counsel, or by a master, as they may prefer.

NOTE. As the preceding is a case of special interest and importance, the case of Newton v. Bushong [22 Grat. 484, 628], decided by the supreme court of appeals for the state of Virginia, at the fall term, 1872, involving the same questions, is appended here. See, also, the case of Perdicaris v. Charleston Gas Light Co. [Case No. 10,974].

Newton v. Bushong—B., a resident of Indiana, during the late war, had a legacy which had been left him which came to the hands of N., executor, in July, 1861 (and which was deposited in bank to the credit of N., executor), and reported by the executor to a confederate receiver and confiscated under the confiscation acts of the Confederate states. Held: First. That in a suit by B., against N., since the war, to recover this legacy, N. was not liable. Second. That the citizens of the Confederate States were obliged to obey its laws and mandates, just as much as the citizens of any other government are, and that "contracts made, rights vested, payments made, liabilities incurred, and duties and obligations performed" under those laws are as valid and binding as those made under any other government. Third. The Confederate government was a government de facto in the highest sense of that term. Query.—Was it not a government de jure?

Judge Waller R. Staples delivered the unanimous opinion of the court as follows:

The important question in this case relates to the legacy of Samuel Bushong, a resident of the state of Indiana. This legacy was in March, 1862, reported by the executor to a Confederate receiver, and was confiscated as the property of an alien enemy. According to the statement of the executor, the fund had been in his hands since July, 1861, part of the proceeds of person-

al property belonging to the testator. . . . . There is no evidence of the executor's assent to or participation in the act of confiscation. On the contrary, it is to be inferred that he only made the report and payment because he was ordered to do so by the proper authorities. The question is now presented whether the payment thus made protects the executor against the claim of the legatee? In order properly to discuss this question the acts of confiscation or sequestration passed by the Confederate congress must be briefly noticed. The first of these was passed August 30, 1861; the second, amendatory thereof, February 15, 1862. It is unnecessary to state in detail the various provisions of these acts. It will be seen by reference thereto that it was made the duty of every person having in his possession or under his control the effects of an alien enemy speedily to inform the receiver in his district of the fact. A failure so to do was declared a high misdemeanor, punishable by fine and imprisonment, and also a forfeiture of double the amount at the suit of the government. It was also provided that any person who, after giving such information, should fail to pay over and deliver on demand made by the receiver the money or effects in his hands should stand in contempt, and be proceeded against as in other cases of contempt; and the court or judge was authorized to imprison the offender until he should fully comply with the requirements of the act. Under the provisions of the original act the court was empowered to leave the sequestered property or effects in the possession of the debtor or other person, requiring security for its safe-keeping and payment or delivery whenever required by the court. The amended act, however, makes a very material change in this respect. That act creates a distinction between persons in actual possession of or having under their control the effects of alien enemies and persons owing debts to alien creditors. In the former case immediate payment or delivery was required to be made to the receiver without qualification or condition. In the latter case payment of interest was only exacted, and no execution could be issued during the war against the debtor who faithfully complied with the statute in giving information of his indebtedness. The reason of this distinction is apparent. . . . . In this case the fund was deposited in bank to the credit of the executor, and was, therefore, under his control. He was within the express terms of the law, and the question is, Was he bound to obey it? It will be observed that these provisions were of a highly stringent character; that the Confederate government had the power to enforce them, no one familiar with the history of that period will question. It was a government of paramount force, to whose laws and mandates every citizen within its jurisdiction was constrained to yield implicit obedience; indeed, this was conceded in the argument. It was said, however, that this government was an unlawful and treasonable organization, and that no act done under its authority prejudicial to the rights of the loyal citizens of the United States can be recognized as valid by the courts. In support of this view, an opinion of Chief-Justice Chase, delivered at Richmond in Keppel's Adm'rs v. Petersburg R. Co., is relied on. It seems that Mrs. Keppel was a stockholder in that company, and that a part of her stock was confiscated and sold during the war. In a suit against the company by Mrs. Keppel's administrators the company claimed a credit for the dividends paid the Confederate receiver and to the purchasers of the stock sold. The learned chief-justice conceded that if the dividends belonging to Mrs. Keppel had been set apart to her specially, and the money thus set apart had been taken from the officers of the company without their consent, either actual or menaced, under circumstances amounting to duress, the loss must have been borne by her. But nothing of the kind appeared; no dividends were set apart; there was no force, actual or threatened. On the contrary, the conduct of the company afforded a reasonable inference that they were not involuntary accessories to the whole action of the government. The facts of the case are not reported in the volume to which we have been referred. It is therefore somewhat difficult to understand what is meant by the expression "application of force, actual or menaced, under circumstances amounting to duress." We are not told how far the person holding the effects of an alien enemy was required to go; what amount of resistance he was expected to display in defense of property belonging to a loyal citizen of the United States. A government of supreme authority denouncing the penalties of fine, imprisonment, and forfeiture upon acts of disobedience to its proclaimed will affords as strong an illustration of "menaced force" as can well be imagined. What does it matter that such a government is unlawful? A citizen may be justified in resisting tyranny and oppression, but he is under no obligation, nor can he be required to engage in a hopeless and dangerous contest with the government under which he lives, however illegal it may be, in defense of property confided to his care, either as bailee, agent, or executor. In Thorington v. Smith, 8 Wall. [75 U. S.] 1, Chief-Justice Chase declared that obedience to the authority of the Confederate government in civil or local matters was not only a necessity but a duty. Why should a different rule be established with reference to this executor? Had he refused to pay over the money, every one familiar with the history of that period and the temper of the public mind knows well that the whole power of the courts and the law would have been exerted against him to enforce obedience. What was he to do under such circumstances? How far was he to go in his resistance to the law? Was he to submit to fine and imprisonment? or would the threat of an attachment for contempt have excused him in surrendering the fund? I think the executor was well justified in refusing to incur these hazards—he wisely declined a contest with a government which the whole naval and military power of the United States could not subdue under four years.

We are not disposed, however, to rest the discussion of this case upon this narrow and restricted view. It may be placed upon a higher ground. In Walker v. Christian, 21 Grat. 301, Judge Moncure, speaking for the court, said: "It is immaterial to inquire whether the Confederate government was de jure or de facto only, and if de facto only, for what purposes and to what extent it was a de facto government: that it was such a government, to a considerable extent and for many purposes, if not entirely and for all purposes, can not be denied." It is said, however, by an eminent federal judge, that the Confederate government did not possess all the attributes of a government de facto in the highest degree. The reason he assigns is, that it never expelled the regular authorities from their seats and functions; it never held the national capital; it never asserted any authority to represent the nation. The conclusion he adduces, therefore, is that it must be regarded as an unlawful organization, and all its acts and proceedings for the confiscation of property of loyal citizens must be treated as absolutely null and void. Now, the test here suggested may be a correct one where applied to a people having but one central, consolidated government. In such states or communities, as a general thing, the object of every revolutionary movement is to overthrow and expel the existing government, to occupy the capital, and give laws to the nation. So long as the organization falls short of this result it may be a question whether it possesses the attributes of a de facto government in the highest degree. However this may be, the test suggested can not in justice be applied to the Confederate States. They did not attempt or desire to occupy the national capital as their seat of government, nor to give laws to the people of the United States. The whole scope and object of the movement was a separation from the northern states, the

formation of an independent confederation, the establishment of a new government over their own people within their own territorial limits and jurisdiction. How eminently successful this struggle was, for four years at least, in the attainment of these objects, let the supreme court of the United States answer.

In Mauran v. Insurance Co., 6 Wall. [73 U. S.] 1, the question was presented whether a northern insurance company was liable for the value of a vessel captured by the naval forces of the Confederate government. Mr. Justice Nelson, in discussing the principles governing the rights and liabilities of underwriters in such cases, used the following language: "Still it can not be denied but that by the use of these unlawful and unconstitutional means a government was erected greater in territory than many of the old governments of Europe, complete in the organization of all its parts, containing within its limits more than eleven millions of people, and of sufficient resources in men and money to carry on a civil war of unexampled dimensions; and during all which time the exercise of many belligerent rights was conceded to it or was acquiesced in by the supreme government; such as the treatment of captives, both on land and sea, as prisoners of war, the exchange of prisoners, their vessels captured recognized as prizes of war and dealt with accordingly, their property seized on land referred to judicial tribunals for adjudication, their ports blockaded, and the blockade maintained by a suitable force, and duly notified to neutral powers, the same as in open and public war." Again, elsewhere he declares: "We refer to the conduct of the war as a matter of fact for the purpose of showing that the so-called Confederate States were in the possession of many of the highest attributes of government, sufficiently so to be regarded as the ruling or supreme power of the country, and hence captures under its commission were among those excepted out of the policy by the warranty of the insured." All will acknowledge the force of this description, the accuracy and truth of the picture. If the laws and mandates of a government thus organized and powerful will not protect those who were subject to its jurisdiction and yielded it obedience, it is idle to say that the citizens or subjects of a mere de facto government in any case can claim exemption under its authority. In Thorington v. Smith [supra], Chief Justice Chase expresses the opinion that the Confederate government may be classed among the governments of which Castine and Tampico are examples. Let us see, then, what was decided with reference to Castine. It was an American port, captured by British forces in 1814, and held in possession of British authorities until the treaty of peace in 1815. During that period foreign goods were received into the port under regulations established by the enemy. Some of these goods remained in Castine until after the close of the war. The United States government then asserted a right to levy imposts and duties upon them. The supreme court of the United States decided that this claim could not be sustained; that by the conquest and military occupation of Castine the enemy acquired that firm possession which enabled him to exercise the fullest rights of sovereignty. At the surrender the inhabitants passed under a temporary allegiance to the British government, and were bound by such laws, and such only, as it chose to recognize and enforce. Now, if the learned chief justice be correct in likening the Confederate government to the military occupation of Castine, it would seem that the same results must follow in both cases. The law of paramount force, which protected the citizen against the claim of the United States, would also protect the bailee or fiduciary who had surrendered the fund in his hands to the supreme authority of the country. In such case it does not matter that such authority is denounced as unlawful and treasonable. The same thing may be said of every de facto government. It is unlawful because it is simply de facto. The

right to confiscate the property of enemies during war does not depend upon the lawfulness of the government which enforces it; it is derived from a state of war, and is called the "right of war." Accordingly, when things in action are confiscated, peace being made, those which are paid are deemed to have perished, but those not paid revive and are restored to their creditors. Ware v. Hylton, 3 Dall. [3 U. S.] 227; Vattel, lib. 3, c. 8, § 138, and Id. c. 9, § 161. In the Prize Cases, 2 Black [67 U. S.] 636, the doctrine that the parties to a civil war are in the same predicament as two nations who engage in a contest and have recourse to arms was fully recognized and sustained. It was also there held that the civil war between the United States and the Confederate States attained such character and magnitude as to give to the United States the same rights and powers which they might exercise in the case of a national or foreign war. Among these was the right to blockade southern ports against neutral nations, the right to treat as public enemies all persons residing within the territory controlled by the Confederate authorities, and to seize and confiscate their property. These were declared to be the belligerent rights resulting from a state of war, applicable alike to civil and to foreign wars. It was upon this principle that the United States seized and confiscated the cotton of Mrs. Alexander, a widow lady, residing in the state of Arkansas, who did not even sympathize with the people of the south in the struggle for independence. The supreme court of the United States sustained the act, declaring that the personal dispositions of individuals inhabiting enemies' territory can not, in questions of capture, be the subject of inquiry. [U. S. v. Alexander] 2 Wall. [69 U. S.] 405. According to the law of nations, the justice of the cause being reputed equal between the two enemies, whatever is permitted to one by virtue of a state of war is also permitted to the other. Vattel, 382. It does not matter how the struggle terminated, who the victors and who the vanquished, the question is not one of right, but of power appertaining to a state of war—power flagrante bello. The government of the United States may exercise both sovereign and belligerent powers. In its sovereign capacity it may punish treason by seizing and confiscating the property of the guilty party. This, however, can only be done by the conviction of the offender according to the forms and requirements of the constitution and laws. This guilt must be made to appear judicially. The constitution throws the shield of its protection around the citizen by declaring that no one shall be deprived of his life, liberty, or property, except by due process of law. When, however, civil war exists and the government asserts the rights of a belligerent, such as appertain to a state of war between independent nations, treating all the inhabitants of the opposing section as public enemies, blockading their ports against neutral powers, seizing and confiscating their property without trial and without conviction, it must be content to accept all the results which flow from the position thus assumed. In the Prize Cases it is admitted by Mr. Justice Grier that the parties in a civil war usually concede to each other belligerent rights. In the same cases, Mr. Justice Nelson, delivering a dissenting opinion, in which Judges Taney, Catron, and Clifford concurred, said: "In the case of a rebellion, or resistance of the people of a country against the established government, there is no doubt, if in its progress and enlargement the government thus sought to be overthrown sees fit, it may, by the competent power, recognize or declare the existence of a state of civil war, which will draw after it all the consequences and rights of war between the contending parties, as in the case of a public war;" and in defining the legal consequences resulting from a public war he declares: "All the property of the people of the two countries, on land or sea, are subject to capture and confiscation by the adverse party, as enemies' property, with certain qualifications

as respects property on land." In Wheaton the same doctrine is thus announced. But the general usage of nations requires such a war (civil) as entitling both the contending parties to all the rights of war, as against each other, as well as respects neutral nations. Wheat. Int. Law, § 296; The Tropic Wind Law Rev. July, 1861; Hughes v. Litsey, 5 Am. Law Reg. (N. S.) 148; Price v. Poynter, 1 Bush. 387; Coolidge v. Guthrie [Case No. 3,185]; U. S. Cir. Ct. S. D. Ohio.

It has been urged here and elsewhere that the government of the United States might at the same time exercise both belligerent rights and sovereign rights; belligerent with regard to the opposing section, and sovereign in punishing individuals engaged in resisting its authority. It might be demonstrated, I think, that inasmuch as the war was carried on by sovereign states associated in a common confederacy exercising the highest attributes of government, no citizen taking up arms under the authority of that government and yielding obedience to its laws and mandates can be held amenable to the penalties of treason. It is, however, unnecessary for the purposes of this case to establish that proposition. Let it be conceded that the government of the United States, having reduced the people of the South to submission, has the right to treat them as rebels and traitors. The same may be said of every established government, and the argument carried to its legitimate results proves that in a civil war belligerent rights can only be exercised by the successful party. It may be that the laws of the Confederate government can no longer be enforced, and that no person can claim exemption from punishment for treason under their authority; but what is to be said in respect to contracts made, rights vested, payments made, liabilities incurred, duties and obligations enforced, whilst such laws were in operation? The government of the United States was unable to afford any protection to this executor at the time of this transaction; its courts were not only closed against him, but he was declared an enemy of the United States, and his property liable to capture and confiscation by the authorities of that government. Whatever security he had against violence and wrong, whatever protection for person and property, was derived from the Confederate government. Protection and allegiance are correlative obligations. As the citizen is justified in obeying the laws which protect him, so his rights and liabilities in civil and local matters must be tested and settled by the rules of the government that has dominion over him. The government of the United States obtained many important advantages by the exercise of belligerent power during the war. It seized and confiscated millions of dollars worth of property belonging to Southern citizens who had taken no part in the struggle. It was relieved from all responsibility for acts done on Northern soil and on the ocean by the armies and navies of the Confederate States. Its blockade of Southern ports was respected, and its right to exert against neutral commerce all the privileges of a party to a maritime war fully recognized. The people of the Northern states approved this policy of their government, and reaped all the advantages flowing from it. For the losses they thereby sustained they must for redress look to the government which claimed their allegiance and which received their services. Considerations of natural justice and equity, the laws and usages of nations, require that the people of the South shall not be placed in the position of insurers of funds in their hands lost by the accidents of war.

In considering this case I have been content to concede that the government of the Confederate States was only a government de facto. Whether it was not during its existence something more, is a proposition in respect to which statesmen and jurists will differ so long as a trace of the struggle remains—so long as the fundamental principles of the government excite discussion among men. The decision of that question is not rendered necessary in any aspect of this case. Should it ever arise, I trust this court will meet it with the gravity and deliberation its importance demands.